UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NEIL A. MORGAN, II, et al.,

    Plaintiffs,

v.

FAIRFIELD COUNTY, OHIO, et al.,

    Defendants.

Case No. 2:15-cv-1505
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## **OPINION AND ORDER**

Defendants' Motion for Summary Judgment [ECF No. 42] and Plaintiffs' Motion for Partial Summary Judgment [ECF No. 44] are before the Court. For the following reasons, Defendants' Motion is **GRANTED**, and Plaintiffs' Motion is **DENIED**.

### I.

This case stems from a "knock and talk," turned search of Plaintiffs' residence, which revealed contraband and led to Plaintiffs' arrest and prosecution. (*See* Compl. ¶¶ 1, 7–8, 59 [ECF No. 1].) Alleging violations of their Fourth and Fourteenth Amendment rights, Plaintiffs Neil A. Morgan, II and Anita L. Graf now bring this case against Fairfield County, Ohio; Steve Davis, Mike Kiger, and David L. Levacy (the Fairfield County Commissioners); Dave Phalen (the Fairfield County Sheriff); and several law enforcement officers—Lyle Campbell, Sgt. Rod Hamler, Luke Williams, and John Williamson. (*Id.* at 1–2, 4–5.) Plaintiffs have sued the Commissioners and Sheriff in their official capacities. (*Id.* at 1–2.) Plaintiffs have sued the officers in their official and individual capacities. (*Id.* at 2.)

**A.    The SCRAP Unit**

The Fairfield County Sheriff's Office SCRAP ("Street Crime Reduction and

Apprehension Program") Unit aggressively investigates narcotics complaints and other criminal activity. (*See* Suppression Hr'g Tr. at 8–9 [ECF No. 43-1].) The Unit conducts knock and talks in which officers go to a residence, knock on the door, and advise the resident of the narcotics complaint. (*See* Campbell Dep. at 16–17 [ECF No. 45-4]; Phalen Dep. at 14 [ECF No. 45-7].) If the resident is willing to discuss the complaint, officers ask for consent to search the residence. (Hamler Dep. at 19 [ECF No. 45-6].) The Unit relies on consent searches because it conducts knock and talks based on tips, which, alone, are generally not enough to establish probable cause to obtain a warrant. (*Id.* at 29; Campbell Dep. at 47.)

During knock and talks, an officer knocks on the front door while the other officers typically secure the perimeter of the residence. (*See* Phalen Dep. at 14–17; Williams Dep. at 14–17 [ECF No. 45-4].) Officers secure the perimeter by positioning themselves at each corner of the residence in locations where they can observe each other and the home's exits. (Hamler Dep. at 20–22; *see* Campbell Dep. at 18–20; Phalen Dep. at 16–17; Williams Dep. at 15–17.)

Prior to June 19, 2012, the Fairfield Hocking Major Crimes Unit ("MCU") received two tips that Morgan was operating a methamphetamine lab and a marijuana grow-operation at his 795 Blue Valley Road residence. (*See* Suppression Hr'g Tr. at 10–11.) The MCU passed this information to the SCRAP Unit to investigate. (*See id.* at 10.)

Officers in the SCRAP Unit were familiar with Morgan because officers had visited his residence in 2011. (*See* Campbell Dep. at 77, 79; Morgan Dep. at 61 [ECF No. 45-1].) During that visit, officers obtained consent to search the residence. (Morgan Dep. at 61–62.) The officers did not arrest or issue Morgan a citation following the 2011 search. (*See id.* at 63.)

**B.    The Residence**

Morgan and Graf's residence is situated on a lot of approximately one acre that slopes

2

downhill from the roadway. (Suppression Hr'g Tr. at 21.) The front door is located in the center of the north side of the house—the side that faces Blue Valley Road. (Photographs at PageID 571 [ECF No. 45-12].) A sidewalk leads from the road down to the front door. (*Id.*) The sidewalk also leads to the left (east) side of the residence, where another door is located toward the front of the house. (*Id.*) The house is surrounded by a yard and at least one outbuilding. (*Id.* at PageID 572.) Behind the house and back yard is a wooded area. (*Id.* at PageID 572.) An elevated balcony extends from the rear of the house. (*Id.* at PageID 573–74.) The balcony is not visible from the front of the residence. (*Id.* at PageID 571–72.) A tall, tightly-boarded fence encloses the balcony on the left (east) side. (*Id.* at PageID 573–74.) The rest of the balcony is surrounded by a guard railing, which does not impede a view of the balcony. (*Id.*) "[H]uge pine trees" mark the property line to the right (west) of the residence. (Morgan Dep. at 85.) And the neighbor's house on that side is only visible from a vantage point at or on the neighbor's side of the pine trees. (*Id.* at 86.) Smaller pine trees mark the property line on the left (east) side of the residence. (*Id.* at 85.) When the knock and talk occurred, two "no trespassing" signs were posted on Morgan and Graf's property—one in front of a Winnebago parked on the property and another in a front window of the residence. (Suppression Hr'g Tr. at 129–31.)

### C. The Knock and Talk

Campbell, Hamler, Williams, Williamson, and Noah Bookman—all members of the SCRAP Unit—conducted a knock and talk at Morgan and Graf's residence on June 19, 2012. (*See* Bookman Dep. at 37, 39 [ECF No. 45-3]; Suppression Hr'g Tr. at 12.)[1] Campbell approached and knocked on the front door while the other officers took up predetermined positions along the perimeter of the residence. (Suppression Hr'g Tr. at 12, 14.) Hamler walked to the front left (east) side of the residence. (*See id.* at 34, 100–01; Pls.' Mot. for Summ. J. at 6

---

[1] Bookman participated in the knock and talk but is not a defendant in this case. (*See* Compl. at 1–2, 4–5.)

3

[ECF No. 44].) Williamson walked to the rear left (east) side of the residence. (Suppression Hr'g Tr. at 34.) And Williams and Bookman walked to the rear right (west) side of the residence. (*Id.*)

Graf opened the front door, and Campbell explained that he was there about complaints of drug activity at the residence. (Suppression Hr'g Tr. at 14–15.) Graf informed Campbell that she needed to secure her dog and closed the door. (*Id.* at 15.) While Campbell was standing at the door, Williams, who was at the right rear corner of the residence, observed marijuana plants growing on the elevated rear balcony. (*See id.* at 54–57.) Williams informed the other officers about the marijuana plants over the radio. (*Id.* at 57.) Hamler conveyed the message to Campbell, who then began knocking on the door and telling Graf that she needed to come out and speak with him. (*See* Hamler Dep. at 31; Suppression Hr'g Tr. at 15.) Campbell overheard Graf talking to Morgan inside the residence and stating "[h]ang on, hang on." (Suppression Hr'g Tr. at 16.)

After knocking and yelling several times, Campbell and Hamler decided that they would make an exigent entry out of concern that Graf and Morgan might destroy evidence. (Suppression Hr'g Tr. at 16, 32, 36, 104–05.) Campbell opened the door, stating "Sheriff's Office. You need to come here. We're coming in." (*Id.* at 16.) Campbell then entered the residence and brought Graf and Morgan out of the house and onto the front porch. (*See id.* at 16–17.) The officers conducted a protective sweep of the residence to ensure that no other occupants were inside. (*See id.* at 16–17, 119–20.) They did not view any contraband while conducting the protective sweep. (*See id.* at 121.)

Bookman and Williamson left to obtain a search warrant. (*See* Suppression Hr'g Tr. at 18, 75.) In support of the search warrant application, Bookman signed an affidavit which stated, in part, that he and the other officers, while in the back yard of the residence, observed marijuana plants on the home's rear balcony. (Bookman Aff. at 1–2 [ECF No. 44-1]) After obtaining a

4

warrant, the officers searched Morgan and Graf's residence. (*See* Incident Report at PageID 567 [ECF No. 45-10].) The officers found drugs, paraphernalia, cash, weapons, ammunition, and other incriminating evidence. (*See id.*; Inventory List at 1–2 [ECF No. 45-11].)

**D.     The Prosecution and Current Lawsuit**

Morgan pleaded no contest to the various charges brought against him and was convicted. (Morgan Dep. at 104–07.) Graf took her case before a jury and was also convicted. (*Id.* at 108–09.) In 2014, Ohio's Fifth District Court of Appeals reversed the trial court's suppression ruling and granted Morgan and Graf's motion to suppress the evidence obtained through the knock and talk. (*See id.* at 113.) Morgan and Graf's convictions were vacated, and the State subsequently dismissed the criminal charges. (*See id.*; Graf Dep. at 141 [ECF No. 45-2].)

Plaintiffs filed the present case on April 29, 2015. (Compl. at 1.) They contend that Defendants violated their Fourth and Fourteenth Amendment rights during the June 19 knock and talk. (*See id.* ¶¶ 1, 9–14, 90.) Presently before the Court are the parties' cross-motions for summary judgment on that constitutional claim.

## II.

**A.     Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving party has carried this burden, the nonmoving party must then set forth specific facts

showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating a motion for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-

motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

Plaintiffs bring this action under 42 U.S.C. § 1983, which provides a remedy for "the deprivation of rights, privileges, or immunities secured by the Constitution and laws" with respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on such a claim, plaintiffs must prove (1) that they were deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

**B.     Defendants' Motion for Summary Judgment**

Because the Court concludes that Defendants are entitled to summary judgment, the Court begins, and ends, its analysis with Defendants' Motion for Summary Judgment. The Court first evaluates Plaintiffs' claim against the officers in their individual capacities. The Court then addresses Plaintiffs' municipal liability claim, which encompasses Plaintiffs' claim against the officers in their official capacities.

   **1.     Individual Capacity Claim**

Plaintiffs contend that Campbell, Hamler, Williams, and Williamson are liable in their individual capacities because they violated Plaintiffs Fourth Amendment rights when they viewed marijuana plants from the curtilage of Plaintiffs' residence and then entered the residence and obtained a search warrant based on that observation. (*See* Compl. ¶¶ 56–63, 90 [ECF No. 1]; Pls.' Mot. for Summ. J. at 1–3 [ECF No. 44].) Defendants request summary judgment on this claim because, they argue, the officers are entitled to qualified immunity. (*See* Defs.' Mot. for Summ. J. at 5–17 [ECF No. 42].) Under the doctrine of qualified immunity, "'government

officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether qualified immunity shields a defendant from liability requires the Court to decide (1) whether the facts produced by the plaintiff make out a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the alleged violation. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). A right is clearly established for qualified immunity purposes if "the contours of the right at issue have been made sufficiently clear to give a reasonable official fair warning that the conduct at issue was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). The Court may address these two requirements in any order. *Gavitt*, 835 F.3d at 640. When a defendant raises qualified immunity as an affirmative defense, the plaintiff bears the burden of demonstrating that the officer is not entitled to the defense. *Id.* at 641.

Defendants contend that the second part of the qualified immunity analysis is dispositive. The Court agrees. In a case decided roughly a month after the June 19 incident, the Sixth Circuit held that a person's right not to have his house surrounded by officers during a knock and talk was not clearly established. *Turk v. Comerford*, 488 F. App'x 933, 948 (6th Cir. 2012). In *Turk*, fugitive task force officers surrounded the plaintiff's (Turk's) house as part of an operation intended to obtain information about a fugitive who had last been seen with Turk. *See id.* at 936. In considering whether the task force officers violated the Fourth Amendment "by breaching the curtilage of [Turk's] home," the Sixth Circuit offered the following analysis:

> What is not clear is whether officers' surrounding a house, with no warrant, exigent circumstances, or consent, violates the Fourth Amendment, even during a knock-and-talk. Very few cases address this issue, and what little law exists is not consistent. *Compare United States v. Butler,* No. 06–CR–215, 2007

8

> WL 2220260, at *8 (E.D. Wis. Aug. 1, 2007) (holding that surrounding house during knock-and-talk was justified by legitimate law-enforcement purpose where officers had reason to believe that large quantities of heroin were present), *with United States v. Berry,* 468 F. Supp. 2d 870, 880 (N.D. Tex. 2006) (holding that entry onto curtilage could not be justified as knock-and-talk, where "[t]here were at least eight officers present. The officers carefully planned the operation, staked out their positions surrounding Berry's house, and took cover positions. Four officers entered Berry's patio and approached the front door."). In this scenario, the officers are entitled to qualified immunity, since Turk's right not to have officers surround his house during a knock and talk is not so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd,* 131 S. Ct. at 2083 (internal quotation marks omitted).

*Id.* at 947–48.

Plaintiffs argue that *Turk* does not control the Court's analysis because it is an unpublished decision. (*See* Pls.' Mot. for Summ. J. at 31–32.) The Sixth Circuit has repeatedly stated that its unpublished decisions are not controlling law. *E.g., Shuler v. Garrett,* 715 F.3d 185, 187 n.1 (6th Cir. 2013); *Gardner v. United States,* 443 F. App'x 70, 78 (6th Cir. 2011). And this Court has consistently noted that it is not bound by unpublished Sixth Circuit decisions. *E.g., Onipe v. United States,* No. 2:16-cv-0697, 2017 WL 770670, at *3 (S.D. Ohio Feb. 28, 2017); *Schumacher v. State Auto. Mut. Ins. Co.,* 47 F. Supp. 3d 618, 632 (S.D. Ohio 2014). But even though *Turk* may not be binding precedent, it is, nonetheless, persuasive authority. *See Gardner,* 443 F. App'x at 78 (following an unpublished decision); *Onipe,* 2017 WL 770670, at *3 (same).

*Turk* is persuasive because it considered the state of the law, at the relevant time period, regarding intrusions into a home's curtilage during a knock and talk. *See Turk,* 488 F. App'x at 947–48. Although Plaintiffs have cited various cases recognizing the Fourth Amendment protections that extend to a home's curtilage, (*see* Pls.' Mot. for Summ. J. at 10–16), Plaintiffs have not identified cases from which the Court can conclude that in June 2012 the right to be free from officers entering the curtilage of a home during a knock and talk was clearly established in

the Sixth Circuit. Based on the case law within the circuit at the time, a reasonable official would not have had fair warning that surrounding a house during a knock and talk was unconstitutional. *See Baynes*, 799 F.3d at 613. And because the officers did not violate a clearly established right, they are entitled to qualified immunity on Plaintiffs' individual capacity claim.[2]

### 2. Municipal Liability Claim

In addition to suing Fairfield County, Plaintiffs have also sued various Defendants in their official capacities. (Compl. at 1–2 [ECF No. 1].) Because "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents," the Court considers these claims together. *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000).

A municipality may be held liable under § 1983 "only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). Proof of a single incident of unconstitutional activity can establish municipal liability only if "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985). Where, by contrast, "the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)).

---

[2] The Court notes that, on direct appeal of the state criminal charges, the Ohio Court of Appeals did not address, and had no reason to consider, whether the conduct of the individual Defendants herein violated a clearly established constitutional right.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. Thus, to establish deliberate indifference, a plaintiff ordinarily "'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the [policy was] likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, Plaintiffs contend that Fairfield County had an unconstitutional policy of surrounding homes during knock and talks and that this policy caused the officers to violate Plaintiffs' Fourth Amendment rights. (*See* Pls.' Mot. for Summ. J. at 20.) Plaintiffs imply that this policy is facially unlawful and that, therefore, the application of the policy in the present case is sufficient to establish municipal liability. (*See id.*) The Court disagrees.

Viewed in the light most favorable to Plaintiffs, the evidence shows that the County had a policy of surrounding homes during knock and talks. (*See* Phalen Dep. at 14–17 [ECF No. 45-7]; Williams Dep. at 14–17 [ECF No. 45-4].) That policy, however, is not facially unlawful. Whether the area surrounding a home is curtilage (and, thus, enjoys Fourth Amendment protection) is a determination "based on the unique facts of each case" that requires a court to consider four factors: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation. *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 403 (6th Cir. 2012). Given the diversity of knock and talk circumstances, as well as the various factors involved in a determination of what is or is not curtilage, a policy of surrounding homes during knock and talks does not always lead to a constitutional violation. That is, while officers might violate Fourth Amendment rights by

11

intruding upon a home's curtilage during some knock and talks, the act of surrounding a home does not inherently violate the Fourth Amendment.[3]

Because the County's alleged policy is not facially unlawful, Plaintiffs must, to survive summary judgment, produce evidence indicating that the County acted with deliberate indifference in its application of the alleged home-surrounding policy. *See Gregory*, 444 F.3d at 752. Plaintiffs, however, have not offered any evidence to suggest that the County ignored a history of abuse and that the County was clearly on notice that the alleged policy was likely to cause injury. *See Miller*, 606 F.3d at 255. Plaintiffs do not point to any prior constitutional violations caused by the alleged policy. Nor do Plaintiffs even identify any allegations of prior constitutional violations. Without evidence demonstrating the County's deliberate indifference, no jury could reasonably find in Plaintiffs' favor on the municipal liability claim, and Defendants are, therefore, entitled to summary judgment.

### III.

For these reasons, Defendants' Motion for Summary Judgment [ECF No. 42] is **GRANTED**, and Plaintiffs' Motion for Partial Summary Judgment [ECF No. 44] is **DENIED**. The Clerk is **DIRECTED** to enter final judgment in this matter.

**IT IS SO ORDERED.**

9-19-2017
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] In arriving at this conclusion, the Court does not express any view on whether the area traversed by the officers in this case constitutes curtilage.